IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 3:24-CR-16-TAV-DCP |
| | ) | |
| MICHAEL CHARLES HOFFPOWIER, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case is before the undersigned for report and recommendation on Defendant Michael Hoffpowier's Motion to Suppress [Doc. 30] evidence seized during the warrantless search of his vehicle on February 13, 2024. *See* 28 U.S.C. § 636(b). Defendant, who is charged with possession of an unregistered firearm and stalking, challenges the seizure of his person and the search of his vehicle on Fourth Amendment grounds [*Id*. at 1; Doc. 35 p. 2].

On February 12, 2024, Defendant's estranged wife B.H. called police to report that Defendant made an appointment with her at the healthcare facility where she works under a false name, and when her employer canceled the appointment, Defendant stated he would come anyway. Later that day, B.H. met with Detective Kelley Talbot to whom B.H. recounted a prior instance of harassment by Defendant and a similar instance of Defendant seeking her out at her job in another state. B.H. completed paperwork to obtain an order of protection against Defendant and made a "safety plan" in the event she encountered Defendant at her workplace the following day.

On February 13, 2024, B.H. reported to law enforcement that Defendant had driven past her workplace and was parked near her office in a black Denali truck. Officers located Defendant in a nearby grocery store parking lot, ordered him out of his truck, and detained him in handcuffs. Defendant permitted officers to view his text messages with B.H., in which B.H. told Defendant

to stay away from her. Officers arrested Defendant and, while securing his truck, saw binoculars on and an empty pistol magazine in the center console. Thereafter, officers searched the truck and seized two firearms and a silencer. Defendant argues that law enforcement lacked probable cause to arrest him and had no lawful basis to search his truck without a warrant.

For the reasons discussed below, the Court finds the officers had probable cause to arrest Defendant for stalking and properly searched Defendant's truck incident to his arrest after observing evidence related to stalking—binoculars and an empty gun magazine—in plain view. Accordingly, the Court respectfully recommends that Defendant's Motion to Suppress [Doc. 30] be denied.

## I.    BACKGROUND

Defendant Hoffpowier is charged with possession of an unregistered firearm, specifically a silencer, on February 13, 2024, in violation of 26 U.S.C. 5841, -5861(d), and -5871, and 18 U.S.C. § 921(a)(3)(C) (Count One) [Doc. 15 p. 1]. The Indictment also charges that from March 2023 to February 13, 2024, Defendant traveled in interstate commerce from Pennsylvania to Knoxville, Tennessee, "with the intent to kill, injure, harass, or place under surveillance with intent to kill, injure, harass, or intimidate another person, B.H., and in the course of and as a result of such travel did cause, attempt to cause, or reasonably expect to cause substantial emotional distress to B.H.," in violation of 18 U.S.C. § 2261A (Count Two) [*Id.*]. These charges arise primarily from the events of February 12 and 13, 2024.

On May 31, 2024, Defendant moved to suppress all evidence obtained from the search of his vehicle, arguing that law enforcement could not search his vehicle incident to his arrest and had no other lawful basis to search his car [Doc. 30 pp. 3–6]. The Government responded in

opposition, contending that after officers saw evidence of stalking in plain view in Defendant's vehicle, they could search it incident to his arrest [Doc. 31 pp. 2–5].

The parties appeared before the undersigned on July 18, 2024, for an evidentiary hearing on the motion. Assistant United States Attorney Miriam Johnson appeared on behalf of the Government. Attorney Joseph A. Fanduzz represented Defendant, who was also present. The Court heard the evidence and arguments presented by the parties. At the hearing, the Court granted Defendant's request to file a post-hearing brief on the legality of Defendant's arrest. Defendant filed a post-hearing brief on August 1, 2024, arguing that that the officers lacked probable cause to arrest him for stalking because the information from B.H. was unreliable and did not show actual emotional distress [Doc. 35 pp. 6–9]. The Government responded in opposition on August 15, 2024, asserting that the officers had probable cause to arrest Defendant based on the account of the victim B.H. and B.H.'s emotional distress can be inferred from information in the record [Doc. 36 pp. 4–6]. Thereafter, the Court took the matter under advisement.

## II.    SUMMARY OF THE EVIDENCE

At the July 18, 2024 evidentiary hearing, the Government presented the testimony of Knox County Sheriff's Office ("KCSO") Detective Kelley Talbot and KCSO Deputy Ryan Collins. Detective Talbot testified that she has worked for the KCSO both as a patrol officer and in the Family Crimes Division for two years and seven months. Prior to that, she was a patrol officer for ten years and a detective for thirteen years in Illinois. During her career, she has investigated thousands of family crimes.

Detective Talbot stated that on February 12, 2024, she was asked to assist Officer Christian Monroe, a patrol officer responding to a call involving potential violation of an existing restraining order or stalking. Detective Talbot called Officer Monroe and advised him to document the

information from the victim in a police report. She and Officer Monroe created a "safety plan" for B.H., who had called police, and Detective Talbot asked that B.H. come to the Family Justice Center and possibly file for an order of protection.

Detective Talbot said that she met with B.H. at the Family Justice Center later that day. B.H. related that Defendant, her estranged husband who lives in Pennsylvania, made an appointment with her for a procedure at the medical facility where she works. When B.H. realized that the appointment was with Defendant, the facility attempted to cancel the appointment because B.H. did not want to meet with him. While meeting with Detective Talbot, B.H. completed the form for an order of protection, but an order of protection did not go into effect that day. Detective Talbot stated that B.H. related her domestic history such as the dynamics of her relationship with Defendant and any past domestic violence or incidents of concern. B.H. told Detective Talbot about incidents involving Defendant in Pennsylvania and Texas. Detective Talbot said they then discussed how to protect B.H. if Defendant came to her work the next day. The safety plan involved B.H. calling Detective Talbot and 9-1-1. B.H.'s workplace also planned to lock the doors until the police arrived. Detective Talbot described B.H.'s demeanor as "casual" during the February 12 meeting.

Detective Talbot testified that B.H. recounted being the victim of harassment "and possibly an assault" by Defendant in Pennsylvania. B.H. also told Detective Talbot that while she was living in Texas, Defendant came to her work unannounced and was asked to leave by the police.

Detective Talbot stated that around 8:21 a.m., on February 13, B.H. called her cellular telephone and said Defendant was at her place of employment. B.H. said Defendant was driving a black Denali with a Pennsylvania license plate. Detective Talbot told B.H. to call 9-1-1 and to keep everyone safe. Detective Talbot then called the dispatcher to learn who was responding to

the call so she could tell those officers about the report from the day before. She called Officer Ryan Collins and passed along the information she had learned from B.H.

Detective Talbot stated that when officers arrived at B.H.'s place of employment, they could not locate Defendant. Detective Talbot arranged for B.H. to return to the Family Justice Center to discuss whether she should go to a shelter. Detective Talbot checked on the status of B.H.'s order of protection, but it was not yet complete. She then called the Assistant District Attorney Debbie Malone and briefed her on the facts of the Texas incident and the recent facts regarding B.H. Detective Talbot said ADA Malone advised that law enforcement could charge Defendant with stalking.

Detective Talbot said she also had a second conversation with B.H. that morning. B.H. reported that Defendant had "passed her" and that she saw Defendant near Kroger. B.H. sent Detective Talbot a screen shot of a text message from an unknown number on February 12. The message was from Defendant. Detective Talbot called Officer Collins and relayed the information that Defendant could be near the Kroger.

Detective Talbot stated the fact that Defendant had traveled to Knoxville "alarmed" her because B.H. and Defendant were estranged and had a pending divorce. Detective Talbot said B.H. said she had told Defendant not to come. Detective Talbot said the fact that Defendant made an appointment at B.H.'s work and then put his plan into action was alarming.

Detective Talbot testified that Officer Collins called her after encountering Defendant at a Kroger about one-half mile from B.H.'s workplace. She talked with Officer Collins about the information she had learned from B.H. that morning. Detective Talbot told Officer Collins to try to get a statement from Defendant and to advise Defendant of his rights if he was in handcuffs. Officer Collins told her about the statements Defendant made and about text messages he saw on

5

Defendant's cell phone. Officer Collins said he found binoculars in Defendant's vehicle. Detective Talbot said she considered the binoculars to be related to the stalking charge, and she was further alarmed that Defendant was using binoculars to commit the crime. After learning about the binoculars, Detective Talbot told Officer Collins to take pictures. They also discussed Defendant's dog that was in his vehicle and arranged for B.H. to pick up the dog.

On cross-examination, Detective Talbot testified that she met with B.H. on February 12, 2024, after 3:00 p.m., and spoke with her for less than thirty minutes. She agreed that B.H. said that she was still married to Defendant but had left him some time ago and moved to Texas to get away from him. Detective Talbot did not recall whether the Defendant was also living in Texas at that time. B.H. reported that Defendant tracked her down in Texas in August 2023. B.H. also told her that in November 2023, she was in Pennsylvania and Defendant showed up. B.H. related that she and Defendant had a fight, the police were called, and she pressed charges for harassment. B.H. also related that she and Defendant signed divorce papers on January 6, 2024, and that she moved to Tennessee at the end of January but did not file the divorce papers. Detective Talbot said B.H. told her that the Defendant had suddenly shown up on her appointment list. Detective Talbot affirmed that her conversation with the victim was "casual."

Detective Talbot said after talking with B.H. on February 12, she did not follow up with authorities in Pennsylvania about the pending case there, nor did she confirm whether B.H. had a no-contact order from Pennsylvania. She agreed that Officer Collins ran both B.H.'s and Defendant's names in NCIC while "on the scene" on February 13, but he could not confirm an order of protection.

Detective Talbot stated that after she spoke with B.H. on the morning of February 13, a staff member from B.H.'s workplace saw Defendant in the vicinity. She agreed that B.H. also told

her that Defendant did not have a driver's license. She said she relayed that information to Officer Collins and told him to confirm that through a computer check.

Detective Talbot agreed that Defendant did not walk into B.H.'s place of employment. Instead, officers located Defendant at a Kroger about one-half mile from B.H.'s workplace. Detective Talbot agreed that she received a call from Officer Collins, who reported that he had Defendant in custody. She also agreed that she asked Officer Collins to advise Defendant of the *Miranda* rights and to question him. She said Officer Collins told her that Defendant claimed to be innocent of stalking. Detective Talbot acknowledged that she told Officer Collins that she did not believe Defendant. She said she made this statement because she believed B.H. whom she thought had no reason to lie. Detective Talbot said she did not believe Defendant because he made an appointment with his soon-to-be ex-wife and then came to Knoxville without her agreement. She acknowledged that at that point, she had not confirmed B.H.'s allegations.

Detective Talbot testified that at the time the officers seized Defendant, there was a warrant for his arrest. She said for the stalking charge, she relied on the information from B.H. on February 12 and 13 along with the information from the district attorney's office, the incidents from Texas and Tennessee, and the fact that Defendant came to Knoxville. She agreed that at the time Defendant was seized, the officers had not corroborated that he was driving on a suspended license.

Detective Talbot said she had several telephone conversations with Officer Collins after he had seized Defendant. She recalled talking with Officer Collins before he searched Defendant's vehicle about text messages on Defendant's cell phone that Defendant wanted to show him. She said she instructed Officer Collins to look at the text messages. They then had a conversation about whether the incident would be reported as a supplement to the February 12 report or would be a new case report.

7

Detective Talbot agreed that Officer Collins subsequently called her again and related that he had arrested Defendant. She said he told her that he saw binoculars and a gun magazine in Defendant's vehicle. She said she believed these to be part of the crime because sometimes stalkers have a secondary plan to hurt someone. She agreed that she would have included everything she thought was relevant in her report. She also agreed that at the time of the search, B.H. had not said Defendant might have a gun or that he had ever threatened her with a gun. Detective Talbot acknowledged that she did not state in her report that B.H. felt emotional distress regarding Defendant's actions. She confirmed that nothing from the investigation led her to believe a gun would be involved.

Detective Talbot said when she spoke with Assistant District Attorney Debbie Malone, she related the facts of the Texas incident and what had occurred here.

On redirect examination, Detective Talbot stated that when Defendant made the appointment at B.H.'s workplace, he used a false name but provided his real telephone number. She said when B.H. called on February 13, she said Defendant was parked nearby but not in the parking lot of her workplace. Detective Talbot thought Defendant was living in Pennsylvania at the time of the incidents. She confirmed that Defendant did not live in Knoxville. She agreed that she met with B.H. after 3:00 p.m. on February 12, 2024. She affirmed that she did not have time to check all the information from B.H. before B.H. called again on the morning of February 13.

Detective Talbot said she relied on the Pennsylvania incident, as well as the incidents from Texas and Tennessee, when charging Defendant. She agreed that she had a lot of experience with stalking cases. She listed the following as typical items of evidence in stalking cases: binoculars, weapons, rope, separate telephones or "burner phones," and items that could be used in secondary crimes if the perpetrator caught the victim.

On re-cross examination, Detective Talbot said after learning that Officer Collins saw an ammunition magazine in Defendant's vehicle, she told him that they did not want to leave any guns in the vehicle. She agreed that the officers on the scene did not see a gun in plain view. She also agreed that she had no information that it would be illegal for Defendant to possess a gun.

The Government also called Officer Ryan Collins, who testified that he has worked for the KCSO for one and one-half years. He said his duties are to investigate crimes, apprehend criminals, patrol in the county, and answer calls for service. On the early morning of February 13, 2024, he was dispatched to a healthcare facility in Farragut. While enroute to that location with Officer Jeremiah Freeland, a probationary officer, Officer Collins spoke with Detective Talbot. He said from Detective Talbot and from the dispatcher's call notes, he learned the history of the incident leading to the service call. Specifically, from these sources, he learned that the suspect had followed the victim from a couple of states, was outside the victim's workplace, and would likely flee when he saw the officers.

Officer Collins said when he arrived at the business, he did not see the vehicle, which was described as a black GMC Denali with Pennsylvania tags. He and Officer Freeland went inside to talk to the victim. He said the victim was not there, but the victim's coworker told him about the safety plan. According to Officer Collins, the victim's coworker said she had seen the Defendant's vehicle, but it was not there now. Officers Collins and Freeland left the victim's workplace and patrolled the nearby area looking for the Denali without success. Officer Collins then received another call from Detective Talbot, who said the Denali had been spotted in the Kroger parking lot, which was one-half mile from the victim's workplace.

Officer Collins said he saw Defendant's vehicle parked in the middle of the Kroger parking lot, and Officer Freeland parked the patrol car behind it. As he approached the passenger-side

9

window and Officer Freeland approached the window on the driver's side, Officer Collins saw the Denali's brake lights illuminate and the vehicle began traveling in reverse. After a short distance, the Denali stopped. Officer Freeland arrived at the driver's window and directed Defendant to get out of the vehicle. Officer Collins said they asked Defendant to exit the vehicle because of the information that he might run from police. Defendant got out of the vehicle as asked but would not move closer to Officer Collins as directed. Officer Collins said he wanted Defendant to move closer to him in case he tried to flee. Officer Collins said at that point, he and Officer Freeland "went hands on and placed [Defendant] in cuffs," detaining him.

Officer Collins said he asked Defendant what he was doing in the Kroger parking lot, and Defendant responded that he was writing a letter to his wife. He said Defendant related that he and his wife had a "toxic relationship" and that both he and his wife had at times instructed the other not to talk to him or her. Officer Collins said he did not give the *Miranda* warnings before asking Defendant the first few questions about Defendant's presence in the parking lot. After providing the *Miranda* warnings, Officer Collins said he questioned Defendant about following the victim to other states, what happened in Texas, why he had a Pennsylvania license plate, and whether anything had happened in Pennsylvania. According to Officer Collins, Defendant said his vehicle had broken down in Texas and he walked seven miles to the victim's workplace so she could help him. Defendant was not from Knoxville, but Officer Collins could not recall when Defendant said he got into town. He thought Defendant was from Texas.

Officer Collins said he asked Defendant if he understood that the victim did not want to speak with him, but Defendant kept insisting that their relationship was messy and that this had been going on awhile. He said Defendant allowed him to retrieve his cell phone from the vehicle and to review some of his texts with the victim. According to Officer Collins, Defendant said his

texts would show that victim told him to meet her at her work. Defendant identified which text messages he should review. Officer Collins said that in the texts that he was able to read, the victim told Defendant to "stay away" or "go home" multiple times. He said he did not have time to review the entire chain of text messages between Defendant and the victim. After reviewing these texts, Officer Collins explained to Defendant that he was under arrest and said he would secure Defendant's vehicle. Officer Collins, who had taken the keys from Defendant earlier, planned to roll up the windows on Defendant's vehicle so nothing would be stolen. Officer Collins said when he and Officer Freeland initially approached the vehicle, the windows were down, and a dog was in the back seat.

Officer Collins said while securing the truck, he saw what he thought was a pistol magazine in the center console. He also saw binoculars in plain view on the center console. Officer Collins then called Detective Talbot and told her that Defendant was now in custody and that he saw a magazine and binoculars in the vehicle. Detective Talbot told him she believed these items were evidence of stalking. Officer Collins said finding the magazine prompted him to search the vehicle because after finding a magazine, he believed he was likely to also find ammunition, weapons, and other items of that nature. Officer Collins said he asked Defendant if he had a firearm in the vehicle, but Defendant said he did not. Officer Collins said he and Officer Freeland continued to search the vehicle and found a firearm in the front and another firearm in the back of the vehicle.[1] He said one of the firearms had a suppressor. They also found night vision goggles in the center

---

[1]     Although Officer Collins testified that one firearm was located in the front and one in the back of the truck, he later testified on cross-examination that both firearms were found in the truck's backseat. The video recording [Exh. 1] reveals that both firearms were seized from the backseat. One firearm was in a pocket on the back of the passenger seat and the other was inside a zipped overnight bag on the backseat.

11

console along with what he thought was an automatic conversion kit for a rifle. Officer Collins photographed the items he seized from the vehicle.

Officer Collins identified the video recording from his body camera of his encounter with Defendant [Exh. 1]. While the video played, Officer Collins explained that the first thirty seconds contain no audio because once he presses the start button on his body camera, which records continuously, it stores the previous thirty seconds and then begins recording the video with sound.

The video recording shows that the officers arrived in the Kroger parking lot and parked in the lane behind but not blocking Defendant's truck [Exh. 1, 9:24:36–40]. When Officer Collins reached the passenger-side rear bumper, he told Defendant to stop and roll the window down, gesturing with his arm in a downward motion [*Id*. at 9:24:53]. Officer Freland conversed with Defendant through the open driver's side window as Officer Collins walked around the back of the truck to the driver's side [*Id*. at 9:25:03–12]. Defendant exited his truck on the driver's side next to Officer Freeland [*Id*. at 9:25:13]. At Officer Freeland's direction, Defendant raised his jacket above his waistband [*Id*. at 9:25:23]. Both officers repeatedly directed Defendant to walk to Officer Collins, who was standing by the back of Defendant's truck, but Defendant did not comply [*Id*. at 9:25:29–35]. The officers then handcuffed Defendant and directed him to sit on or stand by his truck's rear bumper [*Id*. at 9:25:36–9:26:06].

The video recording reveals that when Officer Collins returned from moving the patrol car to a parking spot, Officer Freeland was checking inside and removing items from Defendant's jacket pockets [*Id*. at 9:26:42–54]. A third officer arrived on the scene [*Id*. at 9:27:00–26]. Officer Freeland handed Officer Collins Defendant's Texas driver's license [*Id*. at 9:27:29].

The video shows that approximately two minutes after handcuffing Defendant, Officer Collins told Defendant that he had a couple of questions for him and that he was handcuffed

because he did not comply with the officer's direction to come to him [*Id*. at 9:28:42–47]. Defendant protested that he was just trying to learn what was going on and was not aggressive, nor did he make any quick movements [*Id*. at 9:28:47–9:29:03]. Officer Collins then asked Defendant what he was doing [*Id*. at 9:29:07]. Defendant responded that he was sitting in his truck at a grocery store writing a letter [*Id*. at 9:29:10-12]. Officer Collins asked to whom, and Defendant replied to his wife [*Id*. at 9:29:13–16]. Officer Collins asked Defendant where his wife was, and Defendant responded that she was at work [*Id*. at 9:29:19–26]. Officer Freeland asked where Defendant's wife works, and Defendant responded, "Y'all know where she works" and that he had not done anything wrong [*Id*. at 9:29:27–34]. Officer Collins asked if there was an order of protection from another state, and Defendant denied any order of protection [*Id*. at 9:29:40–43]. In response to Officer Collins's question whether Defendant's wife had told him not to contact her, Defendant stated that he and his wife had been separated for months, that they each had told the other not to contact him or her, and that the relationship is problematic but neither of them are aggressive [*Id*. at 9:29:46–9:30:08].

The video reveals that Defendant denied that he had been following his wife to other states and said she gave him the address of her work [*Id*. at 9:30:10–9:30:20]. Officer Collins asked Defendant if his wife said she wanted to talk to him or to meet, and Defendant said he was here asking to see her, but he had not done anything wrong, and it is not a crime to ask his wife to see him [*Id*. at 9:30:22–9:30:30]. Officer Collins told Defendant that was not why he was in handcuffs [*Id*. at 9:30:30–9:30:34]. Defendant asked why he was still in handcuffs, and Officer Collins responded because he was still talking to Defendant [*Id*. at 9:30:35–9:30:42].

The video shows that Defendant denied having been to his wife's workplace other than to drive past it [*Id*. at 9:30:57–9:31:00]. Defendant said the officers only knew a small portion of the

13

couple's relationship issues and that his wife previously drove five hours and took his truck while he was taking a certification test [*Id*. at 9:31:18–37]. Defendant said they had a "toxic" relationship, have been married for six years, and there is no order of protection [*Id*. at 9:31:40–54]. Defendant said the officers could call the state where his wife said the order is and check [*Id*. at 9:31:58–9:32:04]. He said he would not know where his wife lived or worked if she had not told him but that his wife could tell him one thing and then say something different within thirty minutes [*Id*. at 9:32:05–13]. Defendant said he did not see the officers behind him when he tried to back out of the parking spot [*Id*. at 9:32:21–25]. He said he gave his wife the address of where he was staying because she said she was going to meet him, but instead, she called the police [*Id*. at 9:32:26–38]. He said he was leaving to go to the address that he "just gave her" [*Id*. at 9:32:48–51].

The video reveals that a fourth officer arrived on the scene [*Id*. at 9:32:55]. After questioning Defendant for four minutes, Officer Collins returned to his patrol car and called Detective Talbot [*Id*. at 9:33:30]. Officer Collins reported that he was with Defendant at the Kroger near the victim's work and that Defendant said his wife wanted to meet him, they do not have an order of protection, and they have a toxic relationship [*Id*. at 9:33:30–9:34:15]. Detective Talbot responded[2] that she did not believe Defendant [*Id*. at 9:34:16–19]. Officer Collins told Detective Talbot that Defendant did not show proof that the victim said for him to meet her [*Id*. at 9:34:22–25]. He said they placed Defendant in handcuffs "almost right away" because he tried to back up when they told him to get out of his vehicle and he would not come over to Officer Collins as directed [*Id*. at 9:34:26–37]. Detective Talbot suggested the officers "mirandize" Defendant

---

[2]    Detective Talbot's side of the first telephone conversation in the parking lot was audible and recorded on Officer Collins's body camera.

and question him about his wife telling him to come to Knoxville and whether he has any proof of that [*Id*. at 9:34:40–9:35:01]. Detective Talbot told Officer Collins that the victim thought Defendant had a "burner phone" because he had texted her from two different phone numbers despite her blocking him on every communication outlet [*Id*. at 9:35:05–9:35:10]. Detective Talbot also told Officer Collins that Defendant had some outstanding warrants, but she did not know if they were "extraditable" [*Id*. at 9:35:20–24]. She again asked Officer Collins to read Defendant his rights because they already had Defendant in handcuffs [*Id*. at 9:35:56–9:36:03]. She also asked Officer Collins to check whether Defendant's driver's license is suspended [*Id*. at 9:36:05–07].

The video shows that after talking with Detective Talbot and another officer, Officer Collins returned to Defendant who was still handcuffed and was standing with two officers at the back of his truck and advised Defendant of the *Miranda* warnings [*Id*. at 9:37:27–42]. Defendant responded that he understood his rights and agreed to talk to Officer Collins [*Id*. at 9:37:43–49]. Officer Collins asked Defendant if he would show him the text from Defendant's wife asking him to come meet her here [*Id*. at 9:37:50–59]. Defendant said he did not recall "how far back" his wife texted that [*Id*. at 9:38:00–02]. He said he arrived the previous night to surprise his wife, and since then, his wife had changed her "tune," telling him not to come to her work [*Id*. at 9:38:03–11]. Defendant denied going to his wife's work [*Id*. at 9:38:12–14]. He said his wife told him "it's over" and that she did not want to talk to him. [*Id*. at 9:38:14–19]. Defendant said he asked her to meet with him in public to have a conversation after he had driven so far [*Id*. at 9:38:21–26]. Defendant said he was not a vindictive person and told the officers to look in the front seat of his truck where he had flowers and a note [*Id*. at 9:38:34–41].

15

The video reveals that Officer Collins asked Defendant if he tried to make a medical appointment at his wife's office [*Id*. at 9:38:46–51]. Defendant responded that he was going to surprise his wife because she told him a couple of weeks ago that she could do a procedure for him [*Id*. at 9:38:52–9:39:03]. Defendant said after he was already in Knoxville, his wife called him and told him not to come and her office canceled his appointment [*Id*. at 9:39:07–12]. Defendant denied going into the building or the parking lot of his wife's workplace [*Id*. at 9:39:13–21]. He said, instead, he texted his wife, asking her to meet him on her own terms [*Id*. at 9:39:28–39].

The video shows that thereafter, Officer Collins walked away from Defendant's truck and again called Detective Talbot [*Id*. at 9:39:42–9:43:39]. At the evidentiary hearing, Officer Collins testified that during this conversation, Detective Talbot, whose side of the conversation is not audible on the video, updated him on how the warrants would be signed for this case and on Defendant's "issues" in Texas and in other cases.

The video reveals that after this second conversation with Detective Talbot, Officer Collins returned to the back of Defendant's truck and asked Defendant about him going to his wife's workplace in Texas [*Id*. at 9:43:42–57]. Defendant explained that he was stranded after his vehicle broke down, and he then walked seven miles to his wife's workplace [*Id*. at 9:43:58–9:44:10]. Defendant said he drove from Florida to Austin, Texas, to bring his wife her belongings that she had left in Florida and to put them in a storage facility [*Id*. at 9:44:15–28]. He said when his truck broke down, his wife would not answer his calls, and he did not know anyone else there to assist him [*Id*. at 9:44:16–40]. Defendant said he walked to his wife's work to get a ride to get parts for his truck [*Id*. at 9:44:40–49].

The video shows that Officer Collins asked Defendant, "So, you said I could look at the texts, right?" [*Id*. at 9:45:42–45]. Defendant replied that he had nothing to hide but that he could

16

tell Officer Collins what the texts say [*Id*. at 9:45:55–59]. Officer Collins walked to the driver's side window of the truck and looked through the open window, while Defendant explained that his wife asked him to come take her dancing but after he arrived last night, she said she did not want to see him and did not want him to come to her work [*Id*. at 9:45:43–9:46:06]. Defendant said he did not go to his wife's work [*Id*. at 9:46:06–07]. Officer Collins walked back to Defendant, who remained standing at the back of the truck with other officers, and asked, "So, can I grab the phone or not?" [*Id*. at 9:46:30–34]. Defendant replied that he wanted to see where his cell phone was located and walked with Officer Collins to the driver's side window [*Id*. at 9:46:35–40]. Officer Collins reached through the open window, removed the cell phone from the dash, and began reviewing its contents [*Id*. at 9:46:42–54]. Defendant confirmed that Officer Collins was looking at the texts from his wife [*Id*. at 9:47:10–12]. Defendant told Officer Collins that if he scrolled back far enough, he would see the text from his wife asking him to come here and take her dancing [*Id*. at 9:47:17–23].

At the evidentiary hearing, Officer Collins testified that at twenty-three minutes and thirty-three seconds on the video, there was a text on Defendant's cell phone from his wife telling Defendant to "stay away from me." He said at twenty-three minutes and fifty-eight seconds on the video, there was a text from Defendant's wife saying, "Go home." Officer Collins said Defendant responded, "I don't' care," and his wife replied, "You've been warned." Officer Collins said he could not see the date on these texts. He said he reviewed Defendant's cell phone for photographs of the victim's workplace, but he did not find any.

The video reveals that after scrolling through Defendant's cell phone, Officer Collins returned it to the dash of Defendant's truck [*Id*. at 9:49:05]. Officer Collins then told Defendant that he would be taken into custody for stalking [*Id*. at 9:49:46–50]. Defendant denied stalking his

wife, but Officer Collins responded that it was not his call but the "warrants have already been pulled" [*Id*. at 9:49:49–59]. Defendant asked if he could send his wife a message to pick up his dog, and Officer Collins told him that his wife would pick up his dog, although Defendant would have to work out the details of getting his dog back with the Sheriff's Office because there was now an order of protection against him [*Id*. at 9:50:20–45]. Officer Collins asked Defendant what property he wanted to be transported with him to the jail, and Defendant responded his cell phone, wallet, and keys [*Id*. at 9:50:56–9:51:24]. Defendant then asked if he could roll the window up on his truck [*Id*. at 9:51:26–30]. Officer Collins stated that he would roll up the window and secure the vehicle before Defendant was transported, but the truck would not be towed [*Id*. at 9:51:32–37].

The video shows that Defendant was moved to stand beside Officer Collins's patrol car to await transport, and Officer Collins took Defendant's keys from the truck's tailgate (where Officer Freeland had placed them) and opened the driver's side door [*Id*. at 9:51:49–9:52:18]. A set of binoculars was visible on the center console [*Id*. at 9:52:18]. After Officer Collins rolled up the window and retrieved Defendant's cell phone, Defendant asked him to get another set of keys from the console, stating that he has three sets of keys [*Id*. at 9:53:04–10].

At the evidentiary hearing, Officer Collins testified that while removing the keys from Defendant's console, he saw a pistol magazine. The video reveals that Officer Collins then asked another officer to ask Defendant if there is a firearm inside the truck [*Id*. at 9:53:35–37]. Officer Freeland reported that Defendant said, "No" [*Id*. at 9:53:45]. Officer Collins then called Detective Talbot a third time and told her that Defendant was now being transported so B.H. could come get

the dog [*Id*. at 9:54:05–16].[3]  Detective Talbot, whose voice was audible on the body camera, asked if Defendant had showed Officer Collins any text messages [*Id*. at 9:54:42–43].  Detective Collins said he had captured the text messages, in which Defendant's wife told him to stop talking to her, on his body camera [*Id*. at 9:54:44–53].

The video recording reveals that while standing in the open driver's side door of the truck, Officer Collins told Detective Talbot about the binoculars on the center console and the pistol magazine [*Id*. at 9:55:14–24].  Detective Talbot asked Officer Collins to photograph the binoculars and magazine [*Id*. at 9:55:44–46].  Officer Collins told Detective Talbot that Defendant denied having a firearm and that he would "look around," but he did not see one in the truck [*Id*. at 9:55:47–50].  He also told her that Defendant had no outstanding warrants and his driver's license was valid [*Id*. at 9:55:54–9:56:01].  Detective Talbot asked Officer Collins to upload the photographs of the binoculars because they show Defendant's intent as to stalking, and she asked him to confirm no firearms were left in the vehicle [*Id*. at 9:56:38–54].  While talking with Detective Talbot, Officer Collins opened the center console and found what he believed to be a night-vision monocular [*Id*. at 9:57:01–18].

---

[3]    After Officer Collins told Defendant that he was being arrested, Defendant asked to contact B.H. to ask her to take his dog, which was on the backseat of the truck, and Officer Collins responded that B.H. was going to pick up the dog [*Id*. at 9:50:20–24].  Defendant expressed concern about how he would get his dog back, once B.H. had it, and Officer Collins told him that he would have to ask the Sheriff's office because there is an order of protection now [*Id*. at 9:50:29–40].  Later, when Officer Collins called Detective Talbot the third time, he told her, "The wagon just got here.  They're taking him, so she can come and get the dog whenever she wants" [Exh. 1, 9:54:08–13].  Detective Talbot responded, "Awesome, I have her in the area" [9:54:14–16].  After Officer Collins decided to search the car, Officer Collins asked how far away B.H. was [*Id*. at 9:57:33–37].  Detective Talbot responds that B.H. is about ten minutes away and that she would get B.H. to go to the Kroger now [*Id*. at 9:57:37–9:58:02].

19

The video shows that after ending his conversation with Detective Talbot, Officer Collins and another officer searched the cab of Defendant's truck [*Id*. at 9:57:42–10:01:18].[4] Officer Collins found ammunition in the back driver's-side door [*Id*. at 9:59:22–24]. Another officer found a firearm in the pocket behind the passenger seat [*Id*. at 9:59:39]. Officer Collins unzipped and searched Defendant's leather bag, which was on the backseat, and found a second firearm with a silencer attached [*Id*. at 9:59:55–10:00:18].

At the evidentiary hearing, Officer Collins stated that Defendant had flowers in the front passenger-side floorboard and a dessert in his truck. He stated that the officers only found the two firearms that were located in the backseat.

On cross-examination, Officer Collins testified that he did not know whether Defendant's driver's license was suspended at the time he approached Defendant's vehicle and asked him to step out. He said at the time he arrived at the Kroger, he knew from Detective Talbot that it was a domestic case potentially involving stalking and that the DA said a warrant for stalking would be signed. At the time of the "stop," Officer Collins had no indication that a gun was involved. He said he handcuffed Defendant because he knew Defendant was a flight risk, Defendant put his vehicle in reverse when the officers approached, and Defendant failed to comply when he told Defendant to come to him three times. Officer Collins believed the information that Defendant was a flight risk was from B.H. and was in the dispatcher's call notes. He agreed that Defendant was not free to leave while they were investigating the crime.

Officer Collins agreed that he did not know of any active warrants at the time he stopped Defendant and began the investigation. He said he often takes people into custody before an arrest

---

[4] The video recording reveals that officers also searched the bed of Defendant's truck [Exh. 1, 10:02:02–10:03:45].

warrant is signed on the good faith belief that a magistrate will later sign the warrant. In this case, Officer Collins believed he had probable cause to arrest Defendant because Detective Talbot had confirmed the charge with the DA. He agreed he did not talk with the DA.

Officer Collins acknowledged that at one point on the video recording, he questioned Officer Freeland about why he pulled up to Defendant's vehicle initially rather than waiting for a backup officer, as he had directed. He said he was Officer Freeland's training officer and discussed that decision in light of their knowledge that Defendant might flee.

Officer Collins believed he reviewed the text messages from a couple of days on Defendant's cell phone, but he did not recall the dates. He said ultimately, he was instructed to take Defendant into custody for stalking. He agreed he did not arrest Defendant for aggravated stalking. Officer Collins also agreed that Defendant was initially secured in his police car and shortly thereafter placed in the transport vehicle.

Officer Collins said at the time he saw the magazine in Defendant's truck, he had no reason to believe that it was illegal for Defendant to possess a firearm. He said he found a firearm holster next to the magazine. He agreed at that point, he began looking for a firearm. He also agreed that a firearm is not an element of stalking. Officer Collins said he could not recall whether Defendant was charged with stalking or aggravated stalking at the time.

Officer Collins said that he did not intend to tow Defendant's vehicle. Instead, he was going to roll up the windows and lock it. He acknowledged that he had not talked with B.H. at the time of Defendant's stop and arrest. Officer Collins confirmed that during the search of Defendant's vehicle, another officer found the first firearm behind the passenger seat. He agreed that he unzipped and looked through an overnight bag and found a firearm with a silencer.

On redirect examination, Officer Collins explained that the call notes are the notes typed by the 9-1-1 operator in real time as they answer calls. The operator will provide the name of the caller, the telephone number, the address, and a brief description of what is occurring at the scene. He said these notes are updated if new information is provided. Officer Collins identified the call notes from the February 13 incident [Exh. 2]. He noted that the call notes contain a description of Defendant's vehicle and information that Defendant would flee.[5]

Officer Collins stated that he never spoke with the victim and that all information about her came from Detective Talbot. He said he asked Defendant if he had any firearms in his truck, and Defendant said he did not. Officer Collins said he found two firearms in Defendant's truck.

## III. FINDINGS OF FACT

Based upon the testimony and evidence from the evidentiary hearing, the undersigned makes the following factual findings:

On February 12, 2024, B.H., a nurse at medical center in Farragut, Tennessee, contacted the KCSO to report that her estranged husband, Michael Hoffpowier, had made an online appointment with her for the following day using a false name. B.H. said after she recognized her

---

[5]     The Government introduced the dispatcher's call notes relating to the February 13, 2024 service call to the medical center where B.H. works as Exhibit 2. These call notes state that the manager of the medical office building in Farragut, Tennessee, called at 8:26 a.m. to report that an employee's ex-husband, against whom the employee has an order of protection in another state, has been in the parking lot in a black GMC Denali for about one hour [Exh. 2]. The manager noted that the employee is on the scene and that the ex-husband called the day before to try to make an appointment and gave a fake name [*Id.*]. The manager stated that officers came the day before on the "same issue" [*Id.*]. The call notes also reflect that a member of law enforcement "U628" called to report that the female employee B.H., a nurse, "is being stalked by her estranged husband" Michael Charles Hoffpowier [*Id.*]. According to U628, Hoffpowier followed the complainant to Texas and now here from Pennsylvania [*Id.*] U628 related that Hoffpowier is in a black Denali with Pennsylvania license tag and is parked two parking lots over from B.H.'s location [*Id.*]. The call notes state that "[Hoffpowier] needs to be detained on scene per U628" [*Id.*]. The call notes also relate that the subject will flee if he sees officers [*Id.*]. U628 spoke with the District Attorney and the suspect "will be charged with stalking" [*Id.*].

husband's telephone number on the appointment, her employer canceled the appointment, but Defendant responded that he was coming anyway. B.H. met with KCSO Detective Kelley Talbot at the Family Justice Center later that day. B.H. told Detective Talbot that she and her husband were separated and that she moved to Texas to get away from Defendant, but he came to her workplace in Texas unannounced in August 2023 and was asked to leave by police. B.H. also told Detective Talbot about a previous incident of harassment by Defendant in Pennsylvania in November 2023 in which police were called and she pressed charges. B.H. told Detective Talbot that she and Defendant had both signed divorce papers in January 2024, but she did not file them before moving to Tennessee. B.H. told Detective Talbot that she had repeatedly told Defendant that she did not want to see him. Detective Talbot made a safety plan for B.H. that involved B.H. calling Detective Talbot's cell phone and 9-1-1 if Defendant came to her workplace the next day. B.H.'s employer would also lock the doors until officers arrived. B.H. filled out the paperwork for an order of protection against Defendant, but that paperwork was not processed because it was late in the day.

At 8:21 a.m. the following morning, February 13, B.H. called Detective Talbot's cell phone and told her that Defendant was in a parking lot next to her workplace in a black Denali with a Pennsylvania license plate. Detective Talbot told B.H. to call 9-1-1. Detective Talbot also told B.H. to come to the Family Justice Center, so they could discuss whether she should go to a shelter. After speaking with B.H., Detective Talbot called the dispatcher to learn which officer was dispatched to the medical office.

At 8:26 a.m. on February 13, 2024, the manager at B.H.'s workplace called 9-1-1 to report a domestic disturbance, stating that an employee has an order of protection against her ex-husband in another state and that the employee's ex-husband had been sitting in the parking lot for about

one hour. The 9-1-1 operator dispatched KCSO Officer Ryan Collins to respond to the call. While Officer Collins was in route to the medical center, he received a call from Detective Talbot, who informed him of the information from B.H. the previous day. Officer Collins also received the dispatcher's call notes, which stated that pursuant to a call from "U628," a female "is being stalked by [her] ex-husband Michael Hoffpowier, who is in a black Denali with a Pennsylvania license plate and is parked two parking lots away from the medical office where B.H. works. The call notes stated that according to U628, Defendant followed the victim from Pennsylvania to Texas and now here. The call notes also stated that per U628, Defendant "needs to be detained on [the] scene," that the subject will flee if he sees officers, and that "U628 spoke with [the] DA and [Defendant] will be charged with stalking."

After speaking with Officer Collins, Detective Talbot checked on the status of B.H.'s protective order, but it was not yet complete. Detective Talbot then called ADA Debbie Malone and briefed her on the facts relating to B.H. and Defendant, including the incident in which Defendant came to B.H.'s workplace in Texas. ADA Malone advised Detective Talbot that law enforcement could charge Defendant with stalking.

Officers Collins and Jeremiah Freeland responded to B.H.'s workplace, but neither B.H., nor Defendant were there. A coworker told Officer Collins that she saw Defendant's vehicle, but it was no longer there. The officers left the medical office and began patrolling the nearby area looking for the black Denali.

Detective Talbot received a second call from B.H., who advised that Defendant had passed her near Kroger. B.H. also told Detective Talbot that Defendant had contacted her on February 12 using a different number and sent Detective Talbot a screenshot of that text message. Detective Talbot relayed the information that Defendant could be in the Kroger parking lot to Officer Collins.

24

Officers Collins and Freeland drove to the Kroger parking lot, which was one-half mile from B.H.'s medical office. There, they saw Defendant's black Denali truck parked in the parking lot.

The officers parked in the lane behind the Denali but not blocking it. Officer Collins walked toward the passenger side window as Officer Freeland approached on the driver's side. When he reached the rear bumper, Officer Collins yelled and motioned for Defendant to roll down the windows. Defendant began backing out of the parking space but stopped and rolled down the driver's side window. Officer Freeland told him to get out of the truck. Defendant exited his vehicle, and both Officer Collins and Officer Freeland directed Defendant to walk to Officer Collins, who was standing at the back of the truck. When Defendant failed to move after Officer Collins's repeated requests, the officers placed Defendant in handcuffs and moved him to the truck's rear bumper.

Officer Collins moved the patrol car to a nearby parking spot, while Officer Freeland searched Defendant and removed all items from his pockets, placing them on the cover to the truck bed. Officer Collins questioned Defendant about what he was doing in the Kroger parking lot. Defendant stated that he was writing a letter to his wife who was at work. Defendant denied doing anything wrong and denied the existence of an order of protection against him in another state. Defendant told Officer Collins that he and his wife had a toxic relationship and that they had each told the other not to contact him or her at various times. He said he only knew where his wife worked because she told him the address and that he had driven past her workplace but did not go inside. Defendant said he gave his wife the address where he was staying because she was meeting him but, instead, she had called the police.

Following this exchange, Officer Collins called Detective Talbot and told her that he had located Defendant, who said his wife wanted to meet him, there was no order of protection, and

that they have a toxic relationship. He also told Detective Talbot that he had placed Defendant in handcuffs immediately because he was non-compliant and tried to leave. Detective Talbot told Officer Collins to advise Defendant of the *Miranda* warnings and then ask if Defendant had any proof that his wife asked him to come to Knoxville. She told Officer Collins that B.H. thought Defendant could be using a burner phone because he had texted her from two different phone numbers despite her previously blocking him.

Officer Collins returned to Defendant, who was still handcuffed and standing behind his truck, and gave the *Miranda* warnings. Defendant responded that he understood his rights and wanted to talk to Officer Collins. Officer Collins asked if Defendant would show him the text in which his wife had asked him to come to Knoxville. Defendant said he was not sure how long ago that text was. He said he arrived in Knoxville the previous night to surprise his wife, but after he arrived, his wife changed her mind and told him not to come to her work and that she did not want to talk to him. Defendant said he did not go to his wife's work but, instead, asked her to meet him in public so they could have a conversation. Defendant also said that a couple of weeks earlier, his wife had offered to do a medical procedure for him, so he had made an appointment online to surprise her. He said after he was already in Knoxville, his wife told him not to come, and her office canceled the appointment.

Officer Collins called Detective Talbot a second time, and she told him she was obtaining an arrest warrant for Defendant for stalking. She also told him that Defendant had gone to his wife's workplace in Texas and the police were called to ask him to leave. After this conversation, Officer Collins questioned Defendant about the Texas incident. Defendant explained that he drove from Florida to Texas to deliver his wife's belongings to a storage unit, but while there, his truck broke down leaving him stranded. Defendant said he did not know anyone in the area, so he tried

26

calling his wife, who did not answer his calls.  Defendant said he then walked seven miles to his wife's work to ask her to take him to get parts for his truck.

Officer Collins asked to review the texts from Defendant's wife on his cellphone, and Defendant responded that he had nothing to hide but that he could tell Officer Collins what the texts said.  He then explained that his wife had asked him to come to Knoxville to take her dancing, but after he arrived, she said she did not want to see him or for him to come to her work.  When Officer Collins again asked if he could look at Defendant's cell phone, Defendant walked with him to the driver's side window.  Officer Collins reached into the truck through the open window and retrieved Defendant's cell phone from the dash.  Defendant made no objection to Officer Collins looking at the texts on his cell phone but asked Officer Collins to remove his handcuffs so he could show Officer Collins the texts from his wife.  Instead, Officer Collins began reviewing Defendant's texts and asked Defendant if he was looking at the texts from Defendant's wife.  Defendant confirmed that Officer Collins was looking at the correct texts and told Officer Collins that if he scrolled back far enough, he would see the text from Defendant's wife asking him to come to Knoxville and take her dancing.

Officer Collins reviewed the text messages between Defendant and B.H. and saw texts from B.H. telling Defendant to stay away from her and to go home.  Officer Collins returned Defendant's cell phone to the dash of his truck and then informed Defendant that he was being taken into custody for stalking.  When Defendant protested, Officer Collins told Defendant that "the warrants have already been pulled."  Defendant asked if he could contact B.H. to pick up his dog, which was in the truck.  Officer Collins told him that law enforcement had already arranged for B.H. to pick up the dog, but Defendant would have to talk with the Sheriff's Office about getting his dog back because there was now an order of protection in place.

In response to Officer Collins's question of what property Defendant wanted to take with him, Defendant asked for his cell phone, wallet, and keys. Defendant asked to roll up the windows on his truck. Officer Collins told Defendant that he would roll up the windows and secure the truck before Defendant was transported. He told Defendant the truck would not be towed. When Officer Collins opened the driver's side door, binoculars were visible on the center console. After Officer Collins rolled up the window and retrieved Defendant's cell phone, Defendant asked Officer Collins to get another set of keys from the console. While removing the keys from the console, Officer Collins saw a pistol magazine in the console. The officers asked Defendant if he had a gun in his truck, and Defendant denied having a gun.

Officer Collins called Detective Talbot a third time to tell her that Defendant was being transported from the scene so B.H. could now come to the scene to pick up Defendant's dog. Detective Talbot asked if Defendant had shown Officer Collins any text messages. Officer Collins confirmed videoing texts in which B.H. told Defendant to stop talking to her. Officer Collins also told Detective Talbot about the binoculars and pistol magazine in Defendant's truck. Detective Talbot asked Officer Collins to photograph these items as evidence in the stalking case. She also asked him to confirm that no firearms were left in the vehicle. While talking to Detective Talbot, Officer Collins opened the center console and found what he believed to be a night vision monocular. At the end of the conversation, Detective Talbot said she would contact B.H. and get her to come to the Kroger.

After ending his call to Detective Talbott, Officer Collins and another officer searched Defendant's truck. One officer found a handgun in the pocket behind the passenger seat. Officer Collins unzipped a leather overnight bag on the truck's backseat and found a second handgun with a silencer attached.

28

## IV.    ANALYSIS

The Fourth Amendment protects the right to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  Defendant argues that law enforcement violated his Fourth Amendment rights by (1) arresting him without probable cause of any crime and (2) searching his vehicle without a warrant when no exception to the warrant requirement applied.  As a result of these violations, Defendant asks the Court to suppress all evidence flowing from the illegal arrest and search, including a firearm silencer seized from his vehicle.  The Court examines both arguments and finds no Fourth Amendment violation occurred.

### A.  Seizure of Defendant

Defendant contends that B.H.'s statement to Detective Talbot did not provide probable cause for the officers to seize and arrest him for stalking because Detective Talbot did not corroborate any information from B.H., who is an unreliable informant, and B.H. was not in emotional distress [Doc. 35 pp. 5–8].  The Government responds that the officers had probable cause to arrest Defendant based upon B.H.'s eyewitness account to Detective Talbot and Defendant's own actions and admissions on February 13, 2024 [Doc. 36 pp. 4–5].  It also contends that B.H's emotional distress can be inferred from her actions in contacting the police, seeking an order of protection, and implementing the safety plan when she saw Defendant near her workplace [*Id*. at 5–6].

"A warrantless arrest is constitutionally valid if, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [individual] had committed or was committing an offense."  *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (citation omitted).

29

Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citation omitted). In other words, probable cause means a substantial chance or likelihood of criminal conduct. *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (citation omitted). Probable cause is assessed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

With these principles in mind, the Court must first determine when Defendant was arrested and second whether the officers had probable cause to believe Defendant was engaged in stalking at that point.

### 1. Time of Arrest

As an initial matter, the Court finds that Officers Collins and Freeland did not have an arrest warrant for Defendant at the time they first encountered him in the Kroger parking lot. An arrest "'warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.'" *United States v. Baker*, 976 F.3d 636, 644 (6th Cir. 2020) (quoting *Utah v. Strieff*, 579 U.S. 232, 240 (2016) (internal quotation omitted)). The arresting officer is not required to confirm the warrant is supported by probable cause. *Id*. While the dispatcher's call notes stated that the investigating officer had spoken with the district attorney and Defendant would be charged with stalking, no warrant had issued at that time. Officer Collins did not learn about the issuance of an arrest warrant until his second call to (and fourth conversation with) Detective Collins, when she told him that she was getting a warrant for stalking. After that conversation, Officer Collins reviewed Defendant's texts and told Defendant he was under arrest for stalking and that the warrant had been issued.

Defendant argues that he "was unlawfully seized when he was ordered to exit his vehicle, immediately placed into cuffs, and soon thereafter arrested" [Doc. 35 pp. 7–8]. The quintessential test for whether a person is seized for purposes of the Fourth Amendment is whether a reasonable person in the same circumstances would believe himself free to leave. *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Not every restriction on a person's freedom of movement constitutes an arrest. *Florida v. Royer*, 460 U.S. 491, 498 (1983). Law enforcement may temporarily seize a person and conduct an investigatory or *Terry* stop if the officer has "reasonable suspicion" of ongoing criminal activity stemming from "specific and articulable" facts known to the officer at the time of the seizure. *Lewis*, 843 F. App'x at 690 (citing *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968)).

Reasonable suspicion is an amount of proof that is "considerably less" than a preponderance of the evidence. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch' that criminal activity may be afoot." *United States v. Bridges*, 626 F. App'x 620, 623 (6th Cir. 2015) (quoting *United States v. Jeter*, 721 F.3d 746, 751 (6th Cir. 2013)); *see also Terry*, 392 U.S. at 27 (holding that an investigatory stop must be based on more than the officer's "inchoate and unparticularized suspicion or 'hunch'"). The Court evaluates the presence of reasonable suspicion based upon the totality of circumstance at the time the officer decided to make the investigatory stop. *Bridges*, 626 F. App'x at 623. The "collective knowledge doctrine" permits an officer to stop an individual based upon information from another officer "who possesses the facts necessary to establish reasonable suspicion." *United States v. Lyons*, 687 F.3d 754, 765–66 (6th Cir. 2012). Reasonable suspicion "is not a high bar—all that is needed is 'a

minimal level of objective justification'" for the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Sokolow*, 490 U.S. at 7).

Here, Officer Collins had reasonable suspicion to detain Defendant upon his arrival in the Kroger parking lot. At that time, Officer Collins knew from Detective Talbot that B.H. had contacted police because she believed Defendant was coming to her work even though his appointment had been canceled and B.H. had spotted Defendant in a black Denali truck parked near her work that morning. He also knew from an employee at the medical center where B.H. worked that B.H. had a safety plan in place and had left her work and that Defendant's truck was near the medical center. Finally, the dispatcher's call notes reported that B.H. and Defendant were involved in a domestic dispute and that B.H. had an order of protection against Defendant from another state. This information gave rise to a reasonable suspicion that Defendant was stalking B.H.

Almost immediately after detaining Defendant outside of his truck, Officers Collins and Freeland placed Defendant in handcuffs and moved him to the back of his truck. "To determine whether an investigative detention has crossed the line and become an arrest, this court considers factors such as 'the transportation of the detainee to another location, significant restraints on the detainee's freedom of movement involving physical confinement or other coercion preventing the detainee from leaving police custody, and the use of weapons or bodily force.'" *United States v. Lopez-Arias*, 344 F.3d 623, 627 (6th Cir. 2003) (quoting *United States v. Richardson*, 949 F.2d 851, 857 (6th Cir. 1991)). The handcuffing of a suspect does not automatically transform a *Terry* stop into an arrest, "so long as the circumstances warrant that precaution." *Houston v. Clark County Sheriff Deputy John Does 1–5*, 174 F.3d 809, 815 (6th Cir. 1999) (finding the handcuffing of driver and passenger and their placement in the back of the patrol cars were "reasonably

necessary to protect the officers' safety during the investigation" of a shooting of an officer); *see also United States v. Sheckles*, 996 F.3d 330, 345 (6th Cir. 2021) ("handcuffing 'does not affect the legitimacy of the *Terry* stop' as long as the facts justify the precaution" (quoting *United States v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005)). Instead, "[i]ntrusive measures are warranted to secure a detainee only where specific facts lead to an inference that the detainee poses a risk of flight or of violence to the officers." *Brown v. Lewis*, 779 F.3d 401, 415 (6th Cir. 2015); *see also United States v. Biggs*, No. 3:22-cr-00224, 2023 WL 351204, at *4 (M.D. Tenn. Jan. 20, 2023) ("'Handcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest . . . . when circumstances do not warrant the precaution." (citation omitted)).

Here, Officer Collins testified that he handcuffed Defendant out of a concern that Defendant would attempt to flee. This concern was based on the dispatcher's call notes indicating Defendant would flee when he saw police, Defendant's beginning to back out of his parking spot as the officers approached, and Defendant's noncompliant behavior when the officers repeatedly asked him to step away from the door of his truck and closer to Officer Collins. The Court finds that these circumstances warranted the precaution of handcuffing Defendant and did not convert the investigatory detention into an arrest.

"'[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.'" *United States v. West*, 371 F. App'x 625, 630 (6th Cir. 2010) (quoting *Royer*, 460 U.S. at 500). "An investigative *Terry* stop may indeed ripen into an arrest through the passage of time or the use of force." *Houston*, 174 F.3d at 814. Although "[t]here is no rigid time limit" for an investigatory detention, its length "should be reasonably related to the basis for the initial intrusion." *Id*. at 814–15 (finding thirty-five-minute *Terry* stop while suspects were handcuffed, frisked, and questioned was not a de facto arrest). An officer may continue to

question the detainee if the officer's initial questions do not dispel his suspicions. *Id.* at 815. Additionally, while the provision of the *Miranda* warnings does not "automatically" turn an investigatory detention into an arrest, it does show an increase in the seriousness of the detention. *United States v. Obasa*, 15 F.3d 603, 608 (6th Cir. 1994) (citation omitted); *United States v. Clay*, 320 F. App'x 384, 388 (6th Cir. 2014) ("The fact that [the defendant] was read *Miranda* warnings did not automatically convert the encounter into an arrest.").

Following his placement of Defendant in handcuffs and until the time that Officer Collins told Defendant he was under arrest after reviewing the text messages on his cell phone, Officer Collins intermittently questioned Defendant for nearly twenty minutes. During this time, he conferred with other officers on the scene, and twice received additional information from Detective Collins. Defendant's answers to Officer Collins's questions did not dispel the officers' suspicions that Defendant was stalking B.H. Instead, Defendant's answers confirmed several details from B.H., and Defendant admitted that he was still trying to meet with B.H., although she had told him she did not want to see him. Here, Officer Collins advised Defendant of the *Miranda* warnings, but he did so at Detective Talbot's request, which she made as a precaution after learning that Defendant had been handcuffed. Near the end of the questioning, Defendant permitted Officer Collins to review the texts from B.H. on his cell phone. These texts confirmed B.H.'s account to Detective Collins that she did not want Defendant to come to Knoxville and had told him not to come to her workplace and to go home. The Court finds Officer Collins's questioning was not unduly prolonged and did not convert the investigatory detention into an arrest.

Accordingly, the Court finds Defendant was arrested after Officer Collins reviewed the text messages on Defendant's cell phone and told Defendant that he was under arrest.

## 2. Probable Cause

As stated above, an officer has probable cause to arrest an individual if the facts and circumstances known to the officer would permit a reasonable person to believe a criminal offence has been or is being committed. *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009). The officer's determination of probable cause must be based upon "reasonably trustworthy information." *United States v. Torres-Ramos*, 536 F.3d 542, 555 (6th Cir. 2008). The Court examines the totality of the circumstances preceding the arrest to assess whether a reasonable officer would have probable cause. *Id*.

Under Tennessee law, stalking is "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]" Tenn. Code Ann. § 39-17-315(a)(4). "Harassment" for purposes of stalking is defined as "[c]onduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact; . . . [that] is committed with reckless disregard for whether the victim will suffer emotional distress as a result of the conduct; and . . . [t]he victim suffers emotional distress as a result of the conduct." Tenn. Code Ann. § 39-17-315(a)(3)(A)(i)–(iii). Harassment "[d]oes not include constitutionally protected activity or conduct that serves a legitimate purpose." Tenn. Code Ann. § 39-17-315(a)(3)(B). "'Unconsented contact' means any contact with another person that is initiated or continued without that person's consent, or in disregard of that person's expressed desire that the contact be avoided or discontinued." Tenn. Code Ann. § 39-17-315(a)(5). Unconsented contact expressly includes appearing at the person's workplace or contacting the person by telephone. Tenn. Code Ann. § 39-17-315(a)(5)(C) & (E). For purposes of stalking, "emotional distress" is

35

defined as "significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling[.]"

Here, at the time Officer Collins arrested Defendant, he knew Defendant had previously come to B.H.'s workplace in Texas without her consent and against her wishes. He also knew that the previous day, B.H. had canceled an appointment with Defendant, which Defendant made under a false name at her work. Despite B.H. telling Defendant not to come to her work, Defendant told B.H. that he was coming anyway. Out of concern for Defendant showing up at her work against her wishes, B.H. called the police, met with Detective Talbot at the Family Justice Center, and filled out paperwork for an order of protection. Officer Collins also knew that Detective Collins created a safety plan for B.H. to use if Defendant came to her workplace the next day and that B.H. had implemented that safety plan when she saw Defendant parked near her workplace on the morning of February 13. Officer Collins knew that Defendant had texted B.H. using another telephone number after she had blocked his known number. Finally, Defendant admitted to Officer Collins that he went to B.H.'s workplace in Texas, even though she would not answer his calls, and that he had texted with her that day, February 13, asking that they meet, even though B.H. had told him she did not want to see him and to go away. Officer Collins confirmed that B.H. repeatedly told Defendant to leave her alone when he reviewed Defendant's text messages with B.H. Based upon this information, Officer Collins had probable cause to believe that Defendant had stalked and was stalking B.H.

Defendant argues that the information from B.H. was not reliable because B.H. is biased against Defendant and Detective Collins did not corroborate B.H.'s statements about pending criminal charges in Pennsylvania, the couple's pending divorce, or that Defendant's driver's license was suspended [Doc. 35 pp. 6–7]. The Court finds, however, that Officer Collins

corroborated the information from B.H.  When he responded to B.H.'s place of employment at the medical center, B.H. was not present but another employee stated that she had seen Defendant parked in an adjacent parking lot in a black Denali with a Pennsylvania license plate.  Defendant corroborated the Texas incident and that he had contacted B.H. that morning, despite her telling him she did not want to meet with him.  Finally, Officer Collins reviewed the text messages on Defendant's cell phone, which corroborated B.H.'s information that he continued to text her despite her blocking him and that she repeatedly asked him not to contact her.  Thus, the Court finds that Officer Collins could deem the information from B.H. to be trustworthy and rely on it for probable cause.

Defendant also argues that the officers did not have probable cause to arrest Defendant for stalking because they lacked information that B.H. experienced emotional distress [Doc. 35 pp. 8–9].  Defendant points to Detective Talbot's testimony that B.H.'s demeanor was "casual" when she met with B.H. at the Family Justice Center and that B.H. never expressly stated that Defendant's actions caused her emotional distress [*Id*.].  The Government contends that Defendant did not raise this issue until after the close of proof, but "the Court can infer from the proof and testimony that B.H. felt harassed" [Doc. 36 p. 5].

As stated above, probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion."  *Bennett*, 905 F.2d at 934.  Here, Detective Talbot's and Officer Collins's belief that Defendant's repeated unconsented contact with B.H. resulted in B.H. having significant mental suffering or distress was based on more than mere suspicion.  B.H. contacted the KCSO because she believed Defendant was coming to her workplace the following day despite the cancelation of his appointment and her telling him not to come.  B.H. met with Detective Collins that same day and filled out paperwork to obtain an order

of protection against Defendant. B.H. contacted Detective Collins again the next morning after seeing Defendant parked near her workplace, and B.H. left her workplace out of concern for her safety. Detective Talbot urged B.H. to come to the Family Justice Center to discuss whether she needed to go to a shelter. Finally, B.H. would not come to the Kroger parking lot to pick up Defendant's dog until Defendant had been transported from the scene. From these circumstances, Officer Collins could reasonably infer that B.H. had emotional distress from Defendant's conduct.

Accordingly, Defendant's arrest did not violate the Fourth Amendment.

### B. Search of Vehicle

Defendant also contends that neither the search-incident-to arrest exception, nor the inventory exception apply to permit a lawful search of his vehicle [Doc. 30 pp. 4–6]. Warrantless seizures and searches are "'per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Roark*, 36 F.3d 14, 17 (6th Cir. 1994) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). In a warrantless search, the government shoulders the burden of demonstrating that an exception to the warrant requirement applies. *United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir. 1990) (citing *United States v. Jeffers*, 342 U.S. 48, 51 (1951)).

When an officer makes a lawful custodial arrest based on probable cause, the officer is permitted to search the arrestee's person and areas in the arrestee's "'immediate control'" without a warrant and incident to the arrest. *Davis v. United States*, 564 U.S. 229, 232 (2011) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969) (construing area within arrestee's immediate control "to mean the area from within which he might gain possession of a weapon or destructible evidence")). A warrantless search incident to arrest is permitted to secure weapons for officer safety and to seize evidence to prevent its loss or destruction. *Chimel*, 395 U.S. at 762–63.

38

In the vehicle context, a search "incident to the arrest of a recent occupant is justified only if the arrestee was unrestrained and within reaching distance of the passenger compartment at the time of the search, or if it was reasonable for the arresting officers to believe that evidence relevant to the crime of arrest might be found in the vehicle." *United States v. Burford*, 632 F.3d 264, 269 (6th Cir. 2011) (citing *Arizona v. Gant,* 556 U.S. 332, 351 (2009)). Defendant argues that at the time the officer's searched his vehicle, he was handcuffed and detained in the back of the patrol car [Doc. 30 p. 5]. Moreover, he maintains that the officers had no reason to believe evidence of stalking would be in his truck [*Id.*]. In this regard, he argues that the officers had no information that Defendant had ever threatened B.H. with a weapon [*Id.*].

To search a vehicle incident to a recent occupant's arrest, "(1) [the occupant's] arrest must have been lawful (*i.e.*, supported by probable cause and not otherwise unlawful), and (1) it must have been reasonable for the police to believe evidence of [the occupant's] crime of arrest would be found in his vehicle." *United States v. Williams*, 2023 WL 3815097, at *3 (6th Cir. June 5, 2023). Here, the Court determined above that Defendant's arrest was lawful. The Government contends the officers reasonably believed Defendant's truck would contain evidence of stalking after Officer Collins saw binoculars and an empty pistol magazine in plain view [Doc. 31 pp. 4 – 5]. The undersigned agrees.

Here, Detective Talbot testified that binoculars, weapons, rope, and "burner" cell phones would be evidence of stalking. Officer Collins saw binoculars in plain view on the center console and saw an empty pistol magazine in plain view when he retrieved Defendant's keys. Officer Collins stated that upon seeing the empty pistol magazine, he believed that ammunition or firearms would likely be in the truck. The Court also notes that Detective Talbot told Officer Collins that B.H. suspected Defendant could be using a burner phone because he was texting her from an

39

unknown number.  Based upon the items in plain view, Officer Collins reasonably believed that other evidence of stalking would be in Defendant's vehicle.  *See also United States v. Alexander*, 954 F.3d 910, 917 (6th Cir. 2020) (concluding that officer lawfully searched defendant's vehicle for evidence of drug trafficking incident to his arrest but, alternatively, the methamphetamine found in defendant's waistband "viewed in conjunction with the bag of money visible to [the officer] from outside the vehicle—would have established the probable cause necessary to conduct a search of the vehicle pursuant to the automobile exception").

Defendant also argues that Officer Collins could not lawfully search inside his zipped travel bag in the back seat [Doc. 30 p. 6].  Under the search incident to arrest exception, however, "the offense of arrest will supply a basis for searching the passenger compartment of the arrestee's vehicle and any containers therein."  *Arizona v. Gant,* 556 U.S. 332, 344 (2009).  The Court finds the officers lawfully searched the passenger compartment of Defendant's truck and his overnight bag incident to his arrest.[6]

---

[6]    The Court need not address the propriety of the search of the bed of Defendant's truck as Defendant did not challenge the search of the truck bed and the record does not reflect that evidence was seized from the truck bed.

40

## V. CONCLUSION

After carefully considering the parties' arguments and the relevant legal authorities, the undersigned finds law enforcement had probable cause to arrest Defendant for stalking and could lawfully search his vehicle incident to his arrest. Accordingly, the undersigned respectfully **RECOMMENDS** that that Defendant's Motion to Suppress [**Doc. 30**] be denied.[7]

Respectfully submitted,

*Debra C. Poplin*

Debra C. Poplin
United States Magistrate Judge

---

[7] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2) (as amended). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582, 587 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed. of Tchrs*, 829 F.2d 1370, 1373 (6th Cir. 1987).

41